**BRIAN VASTAG,**

**Plaintiff,**

v.

**PRUDENTIAL INSURANCE
COMPANY OF AMERICA,**

**Defendant.**

**Civ. No. 15-6197 (KSH)
(CLW)**

**OPINION**

Defendant Prudential Insurance Company of America ("Prudential")
terminated the short term disability ("STD") benefits plaintiff Brian Vastag was
receiving under his employer's health insurance plan, and denied his application for
long term disability ("LTD") benefits. After his several appeals to the plan
administrator were unsuccessful, Vastag timely filed suit under the Employee
Retirement Income Security Act of 1974, 29 U.S.C. § 1132 ("ERISA"). Both sides
have filed motions for summary judgment (D.E. 30, 31), on which the Court heard
oral argument.

With their moving briefs, both parties filed Statements of Material Facts Not
in Dispute ("SOF") (D.E. 30-11; D.E. 31-11), and responses to those statements.
(D.E. 33-1; D.E. 34-1.) These four submissions take their contents from the
Administrative Record furnished in discovery. It is robust, containing Vastag's
medical records, reports written by physicians and medical providers who treated

him, reports written by non-treating medical professionals who reviewed his records for Prudential, and written communications between Vastag and Prudential over the course of the appeals process.

## I.    Factual Background

Brian Vastag, 44 years old when he filed this case, formerly worked as a science reporter for the Washington Post.  (D.E. 31-11, Vastag's SOF, ¶¶ 8, 9; D.E. 33-1, Prudential's Response to Vastag's SOF, ¶¶ 8, 9.)  Nash Holdings, LLC owns the Washington Post and is the policyholder.  (*Id.* at ¶ 2; *Id.* at ¶ 2.)  Vastag was an award-winning reporter.  (*Id.*; *Id.*)  Even though he is no longer an employee there, the Washington Post's website currently states:

> Brian Vastag is a science reporter at The Washington Post, where he covers general science, the environment, climate change, and space. He covered the 2011 Japanese earthquake and the subsequent meltdown at the Fukushima nuclear plant; the heavy storms that battered the Southeast in 2011; parrot conservation efforts in Qatar; and the final launch of the space shuttle. From 2004 to 2010, Vastag free-lanced for some 40 publications, including U.S. News & World Report, New Scientist, Health, Nature, Science, Scientific American, Science News and National Geographic News. From 2000 to 2004, Vastag served as Washington news editor for the Journal of the American Medical Association. Vastag has made live radio appearances on BBC World Service, WNYC, and Public Radio International's The World, and television appearances on MSNBC and CNN Headline News.[1]

Everything changed in the summer of 2012.  While visiting family in Wisconsin in July, Vastag developed flu-like symptoms, including a high fever, chills, and dizziness.  Still sick a month later, he saw a nurse practitioner in

---

[1] *Brian Vastag*, Washington Post, https://www.washingtonpost.com/people/brian-vastag/?utm_term=.d421ddcb7c71 (last visited May 29, 2018).

Washington, DC, who ran blood tests that showed elevated titers for Epstein Barr Virus (EBV[2]) and Lyme disease.[3] (*Id.* at ¶¶ 13, 16, 17; *Id.* at ¶¶ 13, 16, 17.)

In October of 2012, with continued symptoms of malaise and fatigue—both physically and cognitively—Vastag saw Carlo Tornatore, M.D., a neurologist at Georgetown University Hospital. Dr. Tornatore noted that Vastag was experiencing painful paresthesia, a tingling sensation, in his arms and feet several times each day. On October 19, 2012, Vastag had an MRI of his cervical spine, which Dr. Tornatore read to show an ill-defined area consistent with post viral myelitis. Vastag returned to Georgetown University Hospital in December and March of the following year with continued symptoms. (*Id.* at ¶¶ 19-26; *Id.* at ¶¶ 19-26.)

In August of 2013, over a year after his symptoms began, Vastag saw an allergist-immunologist specialist, Paneez Khoury, M.D., at the National Institute of Allergy and Infectious Disease. Dr. Khoury found that Vastag's pulmonary functioning test showed restricted breathing and his blood work tested positive for several viruses including EBV and Coxsackie. (*Id.* at ¶ 27; *Id.* at ¶ 27.)

---

[2] The Centers for Disease Control and Prevention (CDC) defines EBV as follows: EBV is a member of the herpes virus family and is one of the most common viruses. Symptoms include fatigue, fever, inflamed throat, swollen lymph nodes in the neck, enlarged spleen, swollen liver, and a rash. EBV can cause mononucleosis. *About Epstein-Barr Virus*, Centers for Disease Control and Prevention, https://www.cdc.gov/epstein-barr/about-ebv.html (last visited May 29, 2018).

[3] The CDC defines Lyme disease as follows. It is caused by a bacteria and transmitted to human through the bite of an infected tick. Symptoms include fever, headache, fatigue, and a skin rash. *Lyme Disease*, Centers for Disease Control and Prevention, https://www.cdc.gov/lyme/index.html (last visited May 29, 2018).

On September 17, 2013, Vastag, who was still living in Washington, D.C., sought out Derek Enlander, M.D., a specialist in Chronic Fatigue Syndrome ("CFS") and a faculty member of the Internal Medicine Department at Mount Sinai Medical Center in New York. Dr. Enlander found Vastag's blood work showed elevated indicators for EBV, cytomegalovirus,[4] mycoplasma pneumonia,[5] and Coxsackie virus. (*Id.* at ¶ 28; *Id.* at ¶ 28.)

By January of 2014, Vastag felt unable to keep up with the pace of work. He stopped working at the Washington Post and applied for—and was granted—short-term disability benefits by the carrier then making employee benefits decisions. (D.E. 30-3, Administrative Record, 15.) By letter dated March 7, 2014, Prudential notified Vastag that as of March 1, it had taken over management of disability benefits for Nash Holdings. (D.E. 30-6; Administrative Record, 110.) The March 7 letter asked him to authorize release of his medical information so Prudential could review his disability claim. (*Id.*)

In January, 2014, Vastag consulted with Susan Levine, M.D., a leading CFS expert, who at the time was serving as the chairperson of the United States

[4] The CDC defines cytomegalovirus as follows. Cytomegalovirus is a common virus that often shows no signs or symptoms, but can cause serious health problems for people with weakened immune systems. *Cytomegalovirus (CMV) and Congenital CMV Infection*, Centers for Disease Control and Prevention, https://www.cdc.gov/cmv/index.html (last visited May 29, 2018).

[5] The CDC defines mycoplasma pneumoniae as follows. Mycoplasma pneumoniae is a bacterium that causes infections in the respiratory system. *Mycoplasmac pneumoniae Infection*, Centers for Disease Control and Prevention, https://www.cdc.gov/pneumonia/atypical/mycoplasma/index.html (last visited May 29, 2018).

Department of Health and Human Services Chronic Fatigue Syndrome Advisory Committee. (D.E. 31-11, Vastag's SOF, ¶ 31; D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 31.) This committee provides advice and gives recommendations to the Secretary of Health and Human Services on issues related to CFS. (D.E. 30-4, Administrative Record, 58.)

Dr. Levine diagnosed Vastag with CFS on January 15, 2014. She saw him again in February and found he was experiencing continuing symptoms of trigger points, post exertional malaise, weakness, sore throat, and fatigue. While the parties agree that on April 7, 2014, Dr. Levine diagnosed Vastag with fibromyalgia, Prudential adds that this diagnosis was based on self-reported pain. That same week, Dr. Levine sent Prudential an Attending Physician Statement in which she advised that Vastag was unable to work. One week later, she submitted a Capacity Questionnaire indicating that Vastag could not work even part-time because "he should not perform any type of sustained walking, sitting, or interacting with others over the phone for more than 20 minutes without a break." On May 9, 2014, Dr. Levine submitted another Capacity Questionnaire, adding that Vastag is "incapable of any sustained physical or mental exertion." (D.E. 31-11, Vastag's SOF, ¶¶ 32-40; D.E. 33-1, Prudential's Response to Vastag's SOF, ¶¶ 32-40.)

Prudential hired Denise LeClerc, R.N., to review Vastag's file on May 20, 2014. She disagreed with Dr. Levine's conclusions and stated that Vastag should see other specialists for his sleep and cognitive complaints. According to LeClerc, there were "no exam findings or diagnostic findings" to explain his "claims of

chronic weakness, fatigue and exhaustion." Prudential denied Vastag's claim for STD benefits on June 12, 2014, based in part on Nurse LeClerc's review. On August 8, 2014, Vastag appealed, supplementing his claim with more medical records. With the appeal, he also applied for LTD benefits. (*Id.* at ¶¶ 41-44; *Id.* at ¶¶ 41-44.)

In October, Prudential upheld its denial of STD benefits and denied LTD benefits. This decision was based in part on the report of a rheumatologist, David Knapp M.D., whom Prudential hired to review Vastag's medical records. He described the bloodwork that indicated the presence of infections as "borderline abnormal or non-diagnostic in regards to the claimant's subjective symptoms of fatigue and cognitive decline." (*Id.* at ¶ 27; *Id.* at ¶ 27.) Dr. Knapp acknowledged in his report that tests performed on Vastag came back positive for viral infections, fevers, post-viral myelitis according to the MRI, restricted pulmonary functioning, and central vestibular dysfunction. But he concluded that Vastag was not disabled because objective medical evidence of total disability attributable to CFS was lacking. Dr. Knapp wrote that the absence of referrals for neuropsychological testing and a physical examination was "glaring." (*Id.* at ¶¶ 45-46; *Id.* at ¶¶ 45-46.)

In response, Vastag sought out neuropsychological and physical testing. He underwent Cardiopulmonary Exercise Testing ("CPET") with Chris Snell, Ph. D., on February 4 and 5, 2015. (*Id.* at ¶ 47; *Id.* at ¶ 47.) Dr. Snell holds a doctorate in exercise and movement science, and his research focuses on the functional aspects

of CFS.  (D.E. 30-4, Administrative Record, 60.)  Like Dr. Levine, he chaired the

CFS Advisory Committee to Health and Human Services.  (*Id.*)

The CPET is administered over two days.  Subjects pedal on a stationary bike

while resistance is added incrementally.  (D.E. 31-1; Vastag's Brief in Support of

Summary Judgment, 13.)  The test monitors cardiovascular, respiratory, and

recovery responses, workload, effort, and metabolic response/oxygen consumption.

(*Id.*)  Someone with CFS will perform significantly worse on the second day, which

is referred to as post exertional malaise ("PEM").  (*Id.*)  According to Dr. Levine's

report, the CPET is the gold standard for assessing capacity to work in CFS

patients, something Prudential does not accept.  (D.E. 31-11, Vastag's SOF, ¶ 47;

D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 47.)

Based on the CPET results, Dr. Snell issued a report stating that Vastag

could not work above a sedentary level of exertion and his recovery time of over

seven days exceeded the average time of 24 hours. (D.E. 30-4, Administrative

Record, 121.) He concluded that Vastag "demonstrates poor function and symptom

exacerbation post-exertion; this will severely limit his ability to engage in normal

activities of daily living and precludes full-time work of even a sedentary/stationary

nature."  (*Id.* at 119.)

Dr. Levine also reviewed the results of the CPET in a report dated February

20, 2015.  (D.E. 31-11, Vastag's SOF, ¶ 50; D.E. 33-1, Prudential's Response to

Vastag's SOF, ¶ 50.)  She found that Vastag demonstrated 60% of predicted value

for oxygen consumption, as well as severe impairment of cardiovascular and

respiratory responses, establishing that he suffers from a "debilitating form of CFS." (D.E. 30-4, Administrative Record, 95.)

On February 23, 2015, Vastag underwent a Quantitative Electroencephalogram (qEEG) with Marcie Zinn, Ph.D., whose research focuses on the cognitive neuroscience of infectious diseases, specifically CFS. (D.E. 31-11, Vastag's SOF, ¶ 52; D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 52.) Dr. Zinn concluded that the qEEG revealed abnormal activity in the frontal, temporal, parietal, and occipital regions of the brain, which is "often related to reduced speed and efficiency of information processing." (D.E. 30-4; Administrative Record, 97.)

In addition to the CPET and qEEG testing, Vastag consulted with a clinical psychologist, Sheila Bastien, Ph.D., on February 14 and 15, 2015. (D.E. 31-11, Vastag's SOF, ¶ 54; D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 54.) Dr. Bastien has taught, published, and researched extensively on chronic fatigue syndrome. (D.E. 30-4, Administrative Record, 142-153.) After reviewing the qEEG results and conducting an in person interview, as well as administering various neurocognitive testing in her office, Dr. Bastien found that Vastag had significant problems with visual perception and analysis, scanning speed, attention, visual motor coordination, motor and mental speed, memory, and verbal fluency. (*Id.* at 139.) She noted that the results of the verbal fluency test "placed him in the below average range of impairment and brain dysfunction, and [his score] is only 7 words above the cutoff for what is considered the range of organic brain damage." (*Id.* at 138.)

She found motor abnormalities consistent with CFS, as well as impairment in both short term and long term memory that "is not a normal finding in a healthy individual." (*Id.* at 139.) She concluded that Vastag "is severely impaired, and cannot handle the cognitive demands of work in any occupation on a consistent and predictable basis, and should be considered completely disabled from any work for which he has reasonable training or experience, now and for the foreseeable future." (*Id.*)

On May 27, 2015, Vastag filed another appeal to Prudential and submitted the results of the CPET, the qEEG, and the neurological testing. (D.E. 31-11, Vastag's SOF, ¶ 61; D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 61.) Prudential hired two more outside medical professionals to review Vastag's records. Michael Villanueva, Psy.D., a neuropsychologist, issued a report dated July 7, 2015, that reflects agreement that the qEEG report showed "dysregulation." (D.E. 30-6, Administrative Record, 68.) In denying benefits, Prudential relied on the portion of Dr. Villanueva's report that states the qEEG is "not intended to provide a diagnosis." (D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 52.) Dr. Villanueva's description of the test also notes that while the qEEG may not diagnose CFS, it is "used to evaluate the nature and severity of deregulation in the brain in such conditions as mild traumatic brain injury." (D.E. 30-6, Administrative Record, 68.)

Regarding Dr. Bastien's findings of cognitive impairments, Dr. Villanueva found that her testing was flawed because it lacked a psychosocial and psychiatric

history.  (D.E. 30-6; Administrative Record, 75.)  He also found that Vastag's high IQ score indicates he has no intellectual limitations.  (*Id.*)  He concluded that there is no "evidence of significant cognitive symptoms."  (*Id.* at 78.)

Prudential also hired Melissa Cheng, M.D., who is board certified in preventive medicine and occupational medicine, to conduct an outside review. (D.E. 33-1, Prudential's Response to Vastag's SOF, ¶ 50.)  In her report issued June 18, 2015, she characterized CFS as "a diagnosis of exclusion."  According to Dr. Chen, the CPET is "not diagnostic of the disorder" (D.E. 30-6, Administrative Record, 54), and while "an abnormal cardiopulmonary study may indicate evidence of chronic fatigue," such a finding alone does not confirm CFS.  (*Id.*)  Notwithstanding the various tests done on Vastag—the CPET, the qEEG, the neurological and cognitive tests, and MRI results—Dr. Cheng's report concluded that there "continues to be no discernible manifestation of physical finding, testing, and/or documentation of complaint that would support inability to perform work related function."  (*Id.* at 51.)

Prudential upheld its denial on July 21, 2015.  While taking into account the opinions of his treating medical providers and his self-reported functionality, it relied on the reports completed by "a physician Board Certified in Occupational Medicine and by a Clinical Neuropsychologist, who provided their opinions as to his functional capacity."  (D.E. 30-7, Administrative Record, 43.)  Vastag filed suit against Prudential on August 14, 2015.

## II.    Summary Judgment Standard

Under the standard set forth in the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.   Discussion

Vastag has sued under the section of the ERISA statute authorizing a claimant to file a lawsuit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  He seeks a ruling of the Court that he is disabled under the terms of the plan and that Prudential must pay him STD and LTD benefits retroactive to the denial date and going forward.  (D.E. 31-1, Vastag's Brief in Support of Summary Judgment.) Prudential asks the Court to uphold its denial of benefits.  (D.E. 30-12, Prudential's Brief in Support of Summary Judgment.)  Of critical importance is the level of discretion afforded to Prudential's denial of benefits.  Unsurprisingly, the parties are sharply divided on this point.

### a.  ERISA Review

Asserting a claim under Section 502(a)(1)(B) of ERISA requires the beneficiary or participant to "demonstrate that 'he or she . . . ha[s] a right to benefits that is legally enforceable against the plan,' and that the plan administrator improperly denied those benefits." *Fleisher v. Standard Ins. Co.,* 679 F.3d 116, 120 (3d Cir. 2012) (quoting *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566,

574 (3d Cir. 2006)).  The district court reviews the administrator's determination de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Fleisher,* 679 F.3d at 120.  If the plan does confer discretion, the court reviews the benefits denial using an arbitrary and capricious standard. "An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 121 (quoting *Miller v. Am. Airlines, Inc.,* 632 F.3d 837, 845 (3d Cir.2011) (internal quotation marks omitted)).

Under a de novo standard of review, the court is to "determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 414 (3d Cir. 2011) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002.))  No deference or presumption of correctness is accorded to the plan administrator.  *Id.*  De novo review:

> [D]oes not require that a district court conduct a de novo evidentiary hearing or full trial de novo in making a determination between ERISA claimants.  If the record on review is sufficiently developed, the district court, in its discretion, may merely conduct a de novo review of the record of the administrator's decision, making its own independent benefit determination.

*Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1185 (3d Cir. 1991); *Viera v. Life Ins. Co. of North America*, 871 F. Supp. 2d 379, 384 (E.D. Pa. 2012).

b. **Applicable Standard of Review: De Novo or Arbitrary and Capricious?**

Prudential argues the Court must give deference to its final denial decision under the arbitrary and capricious standard based on language appearing in plan documents, with particular emphasis on provisions in the Summary Plan Description ("SPD"), which Prudential contends is part of the plan. (D.E. 30-12, Prudential's Brief in Support of Summary Judgment, 6.) Vastag argues the plan documents do not give discretion to the plan administrator in deciding eligibility for benefits, and that this Court is empowered to review the denial de novo. (D.E. 31-1, Vastag's Brief in Support of Summary Judgment, 20.)

At oral argument, Prudential acknowledged there is no single document entitled "The Plan."

> There is no document that has been presented by either party here that is titled Employee Welfare Benefit Plan of Graham Holdings.[6] That doesn't exist. There are many cases where that occurs, where employers draft what is called an overall plan or a wrap up plan document. That doesn't exist here. What you have is a bunch of pieces of different information that together make up what the terms are of benefits for this particular set of employees of Graham Holdings. One of those pieces is the group contract. Another is the certificate of insurance. And another is the SPD.

(Oral Arg. Trans. at 8:12-23.)

Consistent with this, Prudential's moving papers set forth that the plan consists of the SPD, the Group Contract and the Booklet-Certificate. (D.E. 30-11, Prudential's SOF, ¶¶ 6-8.) Vastag's position is that the Group Contract and the Booklet Certificate make up the plan, but that the SPD is not part of the plan. (D.E. 34-1, Vastag's Response to Prudential's SOF, ¶¶ 6-8.)

---

[6] Graham Holdings is the predecessor of Nash Holdings, which is the policy holder.

The Group Contract is 13 pages long, and Prudential points to the final provision as conveying discretion.

> If the provisions of the Group Contract do not conform to the requirements of any state or federal law or regulation that applies to the Group Contract, the Group Contract is automatically changed to conform with Prudential's interpretation of the requirements of that law or regulation.

(D.E. 30-2, Administrative Record, 424.)

The Booklet-Certificate is a 46 page document that defines and explains Long Term Disability Coverage. (*Id.* at 431.) Prudential points to passages in the Booklet-Certificate that purportedly confer discretion: that "Prudential determines" a claimant's eligibility and that a claim must be "satisfactory to Prudential." (*Id.* at 442, 445, 454, 463, 476, 477.)

The Third Circuit discussed what plan language effectively confers discretion and insulates a plan administrator from de novo review in *Viera*, 642 F.3d at 414. While noting there are no "magic words," the court held that the clause "proof of loss satisfactory to Us" did not suffice. *Id.* The central question is whether the plan language communicates that the administrator "not only has broad-ranging authority to assess compliance with pre-existing criteria, but also has the power to interpret the rules, to implement the rules, and even to change them entirely." *Id.* at 417 (quoting *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639-40 (7th Cir. 2005)).

Two district courts in this circuit have examined the above-excerpted Group Contract language, and both have held that it does not sufficiently communicate

that the plan administrator has discretion. In this district, Judge McNulty found the language "does not unambiguously communicate that Prudential has the power to interpret rules pertaining to benefits awards or denials." *Ho v. Goldman Sachs & Co. Group Long Term Disability Plan*, No. 13-6104, 2016 WL 8673067, at *7 (D.N.J. Oct. 28, 2016). *See also Herbert v. Prudential Ins. Co. of Am.*, No. 14-2599, 2014 WL 4186553, at *2 (E.D. Pa. Aug. 22, 2014) (holding that the above-quoted language from Prudential's Group Contract "does not inform the beneficiary that Prudential has unlimited discretion. . . . Rather, this statement clearly limits Prudential's discretion to revise the plan document to times when the contract does not conform to state or federal law or regulation.")).

This Court agrees. Prudential merely promises to abide by the law, and if something in the contractual provisions does not conform with applicable law, "the Group Contract is automatically changed to conform with Prudential's interpretation of the requirements" of the law. (D.E. 30-2, Administrative Record, 424.) This statement does not convey that Prudential has the ultimate authority to grant and deny benefits, only that Prudential can adjust terms of the plan when it determines them to be in conflict with the law.

The *Ho* decision also examined the same Booklet-Certificate that Prudential offers here as conferring discretion. In various places, that document uses terms such as "Prudential determines" a claimant's eligibility, and a claim must be "satisfactory to Prudential." (D.E. 30-2, Administrative Record, 442, 445, 454, 463, 476, 477.)

Judge McNulty noted that such language "gets closer," but he ultimately held it "falls short," persuaded by the Seventh Circuit's reasoning in *Diaz*. *Ho*, 2016 WL 8673067, at *7.  The Third Circuit also relied on *Diaz* in deciding *Viera*.

The *Diaz* decision held that the words "Prudential determines," and claims must be "satisfactory to Prudential," were insufficient to confer discretion because such language "does not alert the plan participant to the possibility that Prudential has the power to redefine the entire concept of disability, or regularity of physician care, on a case-by-case basis." *Diaz*, 424 F.3d at 639.  Read together, the *Diaz, Viera,* and *Ho* decisions say that plan language must put the participant on notice that his or her medical situation will be evaluated on a case-by-case basis by Prudential using its own broad authority, including the interpretation of terms and physician care, to grant or deny benefits.  This Court finds that the bits and pieces of Prudential's Booklet-Certificate fall short of that.

That said, the core dispute on the issue of discretion concerns whether the SPD is part of the plan, because it is only there that explicit language about Prudential's discretion appears.  Prudential relies on the following provision:

> The Plan Administrator has delegated the discretionary authority necessary to make benefit determinations to the Plan's Claims Administrators.  The Claims Administrators shall serve as the claims fiduciary under the Plan and shall have sole and discretionary authority to determine conclusively for all parties, and in accordance with the terms of the documents and instruments governing the Plan, any and all questions of fact and interpretation of the Plan provisions related to the amount and type of benefits payable to any participant, spouse, or beneficiary, and construction of all terms of the Plan, including any ambiguities, misstatements, or omissions.

(D.E. 30-2, Administrative Record, 112.)

Vastag directs the Court to the second paragraph of the first page of the SPD:

> This SPD is not a contract, nor is it part of the Plan. Rather, it is designed to summarize the main provisions of the Plan in easy-to-understand language. . . . In the event of any ambiguity or inconsistency between this SPD and the legal 'Plan Document,' the Plan Document will control. In the event of a conflict between the Plan Document and any other written or oral employee communication, the Plan Document will control. In the event of a conflict between the Plan Document and the applicable insurance contracts (e.g. insurance contracts and certificates of coverage provided by the insurer) under which some of the Benefit Coverages are provided, the insurance contracts will govern.

(D.E. 30-2; Administrative Record, 8.)

The Supreme Court has held that SPDs, "important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)." *Cigna Corp. v. Amara*, 563 U.S. 421, 438 (2011). The Court reasoned that "[t]o make the language of a plan summary legally binding will lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers." *Id.* at 437.

In *Ho,* Judge McNulty analyzed the same SPD language that Prudential relies on here. He looked to a widely cited opinion, E*ugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124 (10th Cir. 2011), where, in wrestling with how to interpret *Cigna v. Amara*, the Tenth Circuit held:

> An insurer is not entitled to deferential review merely because it claims the SPD is integrated into the Plan. Rather, the insurer must demonstrate that the SPD is part of the Plan, for example, by the SPD clearly stating on its face that it is part of the Plan. A contrary decision would undermine *Amara*.

*Id.* at 1131.

Applying *Eugene S.*, Judge McNulty found that because the SPD "explicitly *disclaims* incorporation in the Plan," the SPD could not be considered part of the plan. *Ho*, 2016 WL 8673067, at *9. Many other courts confronting the same issue have reasoned the same way.[7]

Here, Prudential decided to fashion its language about benefits across three documents. The SPD specifically states that it is *not a contract* and *not part of the plan.* At oral argument, Vastag urged the Court to take Prudential "at their word": if Prudential states the SPD is not part of the plan, Prudential should not be able to turn around now and say that it is. (Oral Arg. Trans. 37:1.) This Court agrees with other district judges who have examined the proffered documents, and finds an insurer should be held to what its plan language says. The SPD is not part of the plan by its own terms, and neither the Group Contract nor the Booklet-Certificate confers discretion in legally sufficient language. As a consequence, this Court reviews on a de novo standard Prudential's denial of benefits to Vastag.

---

[7] *See, e.g., Gallo v. Prudential Ins. Co. of Am.*, No. 14-55637, 2015 WL 2106178, at *5 (M.D. Fla. Jan. 14, 2015); *Delaney v. Prudential Ins. Co. Of Am.*, 68 F. Supp. 3d 1214, at 1220–21 (D.Or. Dec. 12, 2014); *Herbert v. Prudential Ins. Co. Of Am.*, No. 14-2599, 2014 WL 4186553, at *2 (E.D.Pa. Aug. 22, 2014); *Messer v. Prudential Ins. Co. of Am.*, 2013 WL 1319391, at *8 (W.D.N.C. 2013); *Shoop v. Life Ins. Co. of N. Am.*, 839 F. Supp. 2d 830, 837 (E.D.Va. 2011) ("[E]ven though the SPD states that [the administrator] has sole discretion to interpret the terms of the Policy, the fact that this language is not included in the Policy itself, means [the administrator's] interpretation of the Policy terms is due no deference.")); *Moran v. Life Ins. Co. of N. Am. Misericordia Univ.*, No. 13-765, 2014 WL 4251604, at *8 (M.D. Pa. Aug. 27, 2014); *Khan v. Prudential Ins. Co. of Am.*, No. 08-2292, 2010 WL 1286030, at *3 (D.N.J. Mar. 31, 2010).

### c. Prudential's Denial Decision

As it must, *see Viera*, 642 F.3d at 414, the Court begins its de novo review of Prudential's denial decision with the language of the plan defining disability.  It states:

> You are disabled when Prudential determines that: you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; you are under the regular care of a doctor; you have 20% or more loss in your monthly earnings due to that sickness or injury.  After 24 months of payment, you are disabled when Prudential determines that due to the same sickness or injury: you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience; and you are under the regular care of a doctor.

(D.E. 30-2, Administrative Record, 445.)

There is evidence of what the material and substantial duties of Vastag's employment as a science reporter consist of on the Washington Post's website, which describes him as "cover[ing] general science, the environment, climate change, and space."  The website offers examples of the kind of reporting Vastag was engaged in when he joined the Washington Post.  "He covered the 2011 Japanese earthquake and the subsequent meltdown at the Fukushima nuclear plant; the heavy storms that battered the Southeast in 2011; parrot conservation efforts in Qatar; and the final launch of the space shuttle."[8]  As a science reporter, Vastag did more than publish pieces: he "made live radio appearances on BBC

---

[8] *Brian Vastag*, Washington Post, https://www.washingtonpost.com/people/brian-vastag/?utm_term=.d421ddcb7c71 (last visited May 29, 2018).

World Service, WNYC, and Public Radio International's The World, and television

appearances on MSNBC and CNN Headline News."[9]

For example, Vastag's piece on nearly extinct parrots was published by the

Seattle Times on July 29, 2011.[10]  The level of detail and local color demonstrate

that Vastag went to Qatar and actively gathered information.  A few months prior,

Vastag wrote an article from Tokyo detailing the dangerously high radiation levels

at a nuclear power plant, and the shrinking optimism of workers responding to the

emergency.[11]  This type of reporting demonstrates that his work demanded travel,

as well as concentration, energy, and intellectual rigor.

Next, the Court considers whether Vastag's diagnosis of CFS prevents him

from performing this work. According to the CDC:

> CFS, or myalgic encephalomyelitis (ME) is a serious, long-term illness
> that affects many body systems. People with ME/CFS are often not
> able to do their usual activities.  At times, ME/CFS may confine them
> to bed.  People with ME/CFS have severe fatigue and sleep problems.
> ME/CFS may get worse after people with the illness try to do as much
> as they want or need to do.  This symptom is known as post-exertional
> malaise.  Other symptoms can include problems with thinking and
> concentrating, pain, and dizziness.[12]

---

[9] *Id.*

[10] Brian Vastag, *Saving Endangered Parrot from Edge of Extinction*, The Seattle Times, https://www.seattletimes.com/nation-world/saving-endangered-parrot-from-edge-of-extinction/  (last visited May 29, 2018).

[11] Chico Harlan and Brian Vastag, *Radiation levels at Japan nuclear plant reach new highs as conditions worsen for workers*, The Washington Post, https://www.washingtonpost.com/world/radiation-levels-reach-new-highs-as-conditions-worsen-for-workers/2011/03/27/AFsMLFiB_story.html?utm_term=.1b87cdc8deec (last visited May 29, 2018).

[12] *Myalgic Encephalomyelitis / Chronic Fatgiue Syndrome*, Centers for Disease Control and Prevent, https://www.cdc.gov/me-cfs/ (last visited May 29, 2018).

The CDC adds that CFS can prevent people from normal functioning, including the ability to complete daily tasks like showering and preparing a meal. The exact cause of CFS is unknown, and no laboratory test can directly diagnose it. Therefore, a diagnosis is based on in-depth evaluations of symptoms and medical history. Importantly, the CDC notes that many more people likely suffer from this disease than is reported due to a lack of understanding by healthcare providers.[13]

Defending Prudential's denial of disability benefits, counsel argued that the fundamental issue is not whether Vastag suffers from CFS, but rather:

> The question is . . . what is his capacity to work. . . .
> Much of [Vastag's] briefing goes to arguing whether he has CFS or not. We would argue that our physicians and our external reviewers were commenting on whether the symptoms that he has – the conditions he was articulating, let him to be able to work or not.

(Oral Arg. Trans. at 42:5-12).

This would suggest that the hallmarks of CFS and whether Vastag suffers from it matter less than how the symptoms affect his ability to work. This begs the question the Court posed to counsel: if a defined disease like CFS has debilitating properties, attacks the autonomic nervous system and from that affects the ability to stand and walk and diminishes the restorative powers of sleep, doesn't the kaleidoscope of symptoms that interfere with daily life perforce interfere with the ability to work?

---

[13] *Myalgic Encephalomyelitis/Chronic Fatgiue Syndrome: Symptoms and Diagnosis*, Centers for Disease Control and Prevent, https://www.cdc.gov/me-cfs/ (last visited May 29, 2018).

It bears noting that Vastag presented Prudential with a robust medical file. Two of his many treating physicians, Dr. Derek Enlander and Dr. Susan Levine, are leading experts on CFS. Both of them diagnosed Vastag with CFS and found it totally disabled him. They based their conclusions on objective medical evidence, including blood work, MRI images, and physical examinations and testing. By way of example, after he was denied both STD and LTD benefits, Vastag supplemented his medical file with the CPET that the field of exercise science and medicine considers to be the "gold standard" for evaluating and measuring *functional capacity* in CFS patients. (D.E. 30-4, Administrative Record, 60.) According to the results, Vastag demonstrated "poor function and symptom exacerbation post-exertion [which] will severely limit his ability to engage in normal activities of daily living. . . ." His metabolic responses, workload, cardiovascular responses, respiratory responses, and recovery response were all abnormal. The report notes that a recovery time of 24 hours after exercise testing with minor muscle soreness is considered normal. Vastag's recovery time of over seven days, along with excessive fatigue, pain and symptom exacerbation, "should be considered an extreme reaction to physical activity." (D.E. 30-4, Administrative Record, 119-124.)

The objective medical evidence in the report on heart rate, respiration, oxygen consumption, and work in watts supports the conclusion that Vastag's "ventilatory/anaerobic threshold . . . indicates that even low-level physical activity [such as mild stretching] will demand more energy than can be aerobically

generated." (*Id.* at 124.)  The report explains that the ventilator/anaerobic threshold is

> an important index of the amount of work that can be sustained. . . . Most activities of daily living (reading, walking at a normal pace, computer use, office-type work, etc.) are aerobic in nature and healthy individuals are able to perform such activities for prolonged periods of time with no meaningful physical fatigue.  If the ventilator/anaerobic threshold occurs at low oxygen consumption, normal daily activities may exceed the energy demands that can be met through oxidative metabolism, thus requiring anaerobic metabolism to provide energy. This results in early onset fatigue and prolonged recovery.

(*Id.*)

The report found that Vastag's ventilator/anaerobic threshold was such that

> merely engaging in normal activities of daily living will demand more energy than Mr. Vastag is able to generate aerobically.  Performing such tasks on a consistent basis is a challenge that will likely precipitate the onset/exacerbation of symptoms, including excessive fatigue and pain.  This is both a demonstration of physical impairment and a quantifiable limitation of his ability to function in a work environment.

(*Id.*)

Commenting on Vastag's CPET results, Dr. Levine wrote that he "demonstrated 60% of predicted value for oxygen consumption," which is consistent with his "inability to attain or surpass his anaerobic threshold" and his "severely impaired" cardiovascular and respiratory responses.  She concluded that he suffers from "a severe, debilitating form of CFS."  (D.E. 30-4, Administrative Record, 95.)

Vastag's complaints of fuzzy-headedness, inability to concentrate, and thinking slowly are supported by the qEEG that measured electrical activity in his

brain to test for cognitive deficits. Dr. Zinn, who conducted the test, found abnormal activity in the frontal, temporal, parietal, and occipital regions of the brain. (D.E. 30-4, Administrative Record, 96.) She explained:

> The frontal lobes are involved in executive functioning, abstract thinking, expressive language, sequential planning, mood control and social skills. The temporal lobes are involved in auditory information processing, short-term memory, receptive language on the left and face recognition on the right. To the extent there is a deviation from normal electrical patterns in these structures, then sub-optimal functioning is expected.

(*Id.*)

Dr. Bastien reviewed Vastag's qEEG results and conducted an in-person consultation. One of the particularly troubling results, given the work that Vastag was engaged in at the time his symptoms began, came from the Thurston Verbal Fluency test, which requires the subject to write in a five-minute period as many words as possible that begin with a given letter. Then the subject is given four minutes to write as many words as possible that begin with a different letter. The verbal fluency score is the number of words produced. Dr. Bastien reported:

> Given Mr. Vastag's education level, his professional background, and even his presently demonstrated level of IQ and vocabulary, a score of only 52 words is inconceivable in a healthy individual. With greater than 65 words considered as "normal," I would expect anywhere from 90-120 words from an unimpaired subject. A score of only 52 in this context indicates significant cognitive dysfunction rooted in an organic disorder.

(*Id.* at 139.)

In addition to this medical evidence of both physical and cognitive limitations, Vastag has offered his own accounts of his disease. In a letter to Prudential dated May 27, 2015, he wrote:

> As a reporter, I need to concentrate for long stretches and remember a lot of new information. My memory problems are sometimes so bad that I have difficulty remembering if I just took a pill. Also, after concentrating for 30 to 60 minutes to interview a scientist or write an article, I will 'gray out,' my vision will darken, and I am unable to concentrate or work for the next several hours. Mild physical exertion can also render me bedbound. While the severity of my symptoms fluctuate somewhat, during my worst weeks, I spend 20 to 22 hours a day in bed, as I am unable to stand for more than a few minutes or walk more than a few blocks. This clearly makes it impossible to do my job which requires trips outside the office to interview researchers or government officials or for tours of research facilities.

(D.E. 30-4, Administrative Record, 56.)

On July 14, 2015, Vastag wrote to Francis Collins, the director of the National Institute of Health ("NIH"), urging NIH to dedicate resources to research CFS. The Washington Post published his letter the following week. (D.E. 30-6, Administrative Record, 81.)[14] In it, Vastag observed,

> I have hope that someday I'll be able to stand for more than a few minutes, walk for more than a block or two, maybe even resume my career. (It took me four days, with frequent breaks, to write this letter – that's a bit slow for newspaper work.)

(*Id.* at 86.)

Vastag's personality shines through his writings, perhaps leading Prudential's reviewers to conflate good communication skills with good health.

---

[14] Brian Vastag, *I'm disabled. Can NIH spare a few dimes?*, Washington Post, https://www.washingtonpost.com/news/to-your-health/wp/2015/07/20/dear-dr-collins-im-disabled-can-nih-spare-a-few-dimes/ (last visited on May 29, 2018).

But "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human society." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). Nor need a claimant lose his special talent for communication in order to be found disabled. In October of 2015, NIH announced a new initiative to find the cause of and treatment for CFS, "the mysterious, debilitating condition that disables many of its more than 1 million Americans who have it."[15] Vastag was chosen as one of the subjects of the study.

Vastag's transformation from a prolific and fully engaged reporter to a test subject for research at NIH stands in sharp contrast with Prudential's conclusion in its final denial letter that precipitated this lawsuit:

> While we continue to acknowledge Mr. Vastag's self-reported symptoms and limitations related to cognitive impairments, fatigue, parathesias and tingling in the arms and legs, weakness in the upper and lower extremities, headaches, blurred vision, and post exertional malaise (PEM resulting from Systemic Exertion Intolerance Disease), and fibromyalgia, we maintain that the medical data does not indicate any impairment which would translate into medically supported restrictions and/or limitations in Mr. Vastag's functionality.

(D.E. 30-7, Administrative Record, 43.)

On this record, Prudential's conclusion that the medical data fails to indicate "any impairment which would translate into medically supported restrictions and/or limitations in Mr. Vastag's functionality," and that Vastag can work full bore as a reporter, is perplexing. It is particularly troubling when the CPET directly

---

[15] Lenny Bernstein, *NIH announces new effort to tackle chronic fatigue syndrome*, Washington Post, https://www.washingtonpost.com/news/to-your-health/wp/2015/10/29/nih-announces-new-effort-to-tackle-chronic-fatigue-syndrome/ (last visited on May 29, 2018).

measures functionality and its results illustrate Vastag's inability to engage in normal functioning, let alone the duties of his job. The assessments of Prudential's reviewers are not persuasive when measured against sophisticated and up-to-date medical conclusions made by highly experienced doctors. The conclusion that "the medical data does not indicate any impairment which would translate into medically supported restrictions and/or limitations in Mr. Vastag's functionality" ignores documented physical and cognitive abnormalities most dramatically demonstrated by the CPET and qEEG results.

Contrary to Prudential's claim that Vastag's symptoms and limitations are merely "self-reported," the Administrative Record contains clinical support, which emerged early on from the bloodwork performed when his symptoms began. The gold standard diagnostic tool, the CPET, provided objective evidence of the limitations of Vastag's functional capacity. Notwithstanding, Prudential credited its reviewer, Dr. Cheng's conclusory statement that "[a]n abnormal response with cardiopulmonary testing . . . would not confirm the diagnosis, nor be considered the gold standard of diagnostic interpretation as stated by Dr. Levine's letter." (D.E. 30-6, Administrative Record, 54.) Prudential also credited Dr. Cheng's belief that CFS would require a diagnosis of exclusion; that is, a diagnosis of CFS could only be reached through a process of elimination. (D.E. 30-7, Administrative Record, 50.)

Relying on unsupported statements like this, Prudential concluded that "[f]rom a physical standpoint, despite reported symptomology, Mr. Vastag's noted clinical presentation and lack of examination and/or diagnostic findings fail to

support an inability to function." (D.E. 30-7, Administrative Record, 43.)  But such dismissive statements ignore the fact that Vastag produced plenty of "diagnostic findings" in the CPET report, the qEEG report, and the Thurston verbal fluency report, among others.  Additionally, Vastag points to a February 2015 report by NIH which outlines how a CFS diagnosis is reached—without a process of elimination—establishing that Dr. Cheng's opinion that CFS requires a diagnosis of exclusion is outdated and in error.  (D.E. 34, Vastag's Brief in Opposition, 17.)[16]

 None of the reviewers that Prudential principally relied on—Nurse LeClerc and Drs. Knapp, Villanueva, and Cheng—demonstrated any expertise in CFS. When they did note objective evidence about symptoms, they opined that more testing had to be performed.  (And it was:  Vastag went ahead and submitted to more testing which yielded more supportive outcomes.)  All of Prudentials' reviewers appear either to reject or not be aware of the significance of a hallmark of CFS.  According to the CDC: "ME/CFS may *get worse after people with the illness try to do as much as they want or need to do.  This symptom is known as post-exertional malaise (PEM)."[17]  (Emphasis added.)  In other words, people with CFS cannot snap out of their symptoms; when they force themselves to function, they get worse.

_____

[16] Another error, not attributable to Prudential's medical reviewers, bears noting. Prudential offered the fact Vastag traveled to Hawaii during his claimed disability period, took a helicopter ride, and visited the National Tropical Botanical Garden to see rare plants (D.E. 30-11, Prudential's SOF ¶ 41) to show he was not disabled (and, presumably, malingering).  But according to Vastag, he moved to Hawaii. (D.E. 34-1, Vastag's Response to Prudential's SOF ¶ 41.)

[17] *Myalgic Encephalomyelitis/Chronic Fatgiue Syndrome: Symptoms and Diagnosis*, Centers for Disease Control and Prevent, https://www.cdc.gov/me-cfs/ (last visited May 29, 2018).

Interestingly, the conclusion in the denial letter acknowledges PEM, but lumps it into a "'self-reported" series of "symptoms and limitations" that are "related to . . . post exertional malaise." (D.E. 30-7, Administrative Record, 43.) Trying to pin down what this passage means, the Court must assume that Prudential is extrapolating from its reviewers' conclusions either that CFS is not a real disease—Dr. Cheng's "diagnosis of exclusion" (D.E. 30-7, Administrative Record, 50)—or that Vastag does have CFS but its effects do not disable him despite preventing him from conducting the normal activities of daily life, which is the essence of the disease. Either way, the assessment indicates a significant failure to understand the current state of medical knowledge about CFS and its devastating impact on Vastag.

The Court is satisfied that the Administrative Record contains objective medical evidence that Vastag suffers from a seriously debilitating disease. In determining that he was able to perform the material duties of a reporter for the Washington Post, the plan administrator was in error.

## IV.    Remedy

Having found on de novo review that Prudential did not "ma[k]e a correct decision," *Viera*, 642 F.3d at 414, the Court must decide the proper remedy: a retroactive award of past benefits, as Vastag urges, or a remand back to Prudential, as Prudential urges. (D.E. 31-1, Vastag's Motion for Summary Judgment, 37; Oral Arg. Trans. 50:18-21; D.E. 33, Prudential's Br. in Opp. To Vastag's Motion for Summary Judgment, 25; Oral Arg. Trans. 48:2-5.)

In *Miller v. American Airlines*, 632 F.3d at 856, the Third Circuit held that "retroactive reinstatement of a claimant's benefits is the proper remedy when the administrator's termination decision was unreasonable. . . . In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination." *Id.* There, because benefits had been approved and then unlawfully terminated, the Third Circuit upheld the district court's decision to reinstate benefits. *Id.* at 857.

In an earlier case, the Third Circuit also affirmed the district court's direct award of benefits where the plan administrator's "speculative opinions and suspicions concerning the genuineness of Carney's disability were entirely unsupported by any medical evidence." *Carney v. Intl. Broth of Elec. Workers Local Union 98 Pension Fund*, 66 F. App'x 381, 386 (3d Cir. 2003.) The Third Circuit reasoned that "[t]o allow the [plan administrator] yet another opportunity to substantiate their suspicions after they already had nearly four years of administrative proceedings, including two administrative appeals, within which to conduct a further investigation into Carney's medical condition, would contravene the underlying policies of ERISA." *Id.* at 387.

The First Circuit has held that district courts have "considerable discretion" to fashion a remedy in the ERISA context, and that "a remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that the denial of benefits based on the record was unreasonable." *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 24 (1st Cir.

2003.)  The Ninth Circuit also acknowledged that "a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1162 (9th Cir. 2001.)

A categorical application of *Miller* might suggest a remand on the basis that Prudential denied Vastag's LTD benefits from the outset.  However, Vastag actually was receiving STD benefits when Prudential took over administering his claim, and Prudential terminated them.  *Carney* offers good precedent for an award rather than remand; there is ample evidence in the Administrative Record of Vastag's disability, and Prudential had several opportunities to reconsider its previous denials as Vastag repeatedly presented the administrator with more evidence of his diagnosis and disability.   This Court notes its "considerable discretion" to fashion a remedy, and concludes further remand on his eligibility for STD and LTD benefits would be futile, especially after Vastag's multiple appeals.

The denial of benefits by the plan administrator is reversed and the plan administrator is directed to pay all retroactively owed STD and LTD benefits due Vastag under the terms of the plan.

The Court notes that Prudential's denial was limited to Vastag's ability to perform the material and substantial duties of his employment as a science reporter.  At oral argument, counsel for Prudential reminded the Court that "[t]here's been no determination made under 'any occupation standard,'" and that Prudential should "have an opportunity to make that determination."  (Oral Arg. Trans. 47:24-25, 48:4-5.)  The Court agrees, and remands for a determination by

Prudential whether Vastag is eligible to receive additional disability benefits under the "any gainful occupation" standard.

## V.    Conclusion

Vastag has demonstrated that the plan administrator improperly denied him STD and LTD benefits payable under the plan, and that he has a legally enforceable right to them. *Fleisher,* 679 F.3d at 120. His motion for summary judgment is granted, and Prudential's motion for summary judgment is denied.

An appropriate order accompanies this opinion.

s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

Dated: May 31, 2018